IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELEONORE MANDENGUE,

    *Plaintiff*,

    v.

ADT SECURITY SYSTEMS, INC.,

    *Defendant*.

Civil Action No. ELH-09-3103

**MEMORANDUM OPINION**

Eleonore Mandengue, plaintiff, filed suit against ADT Security Systems, Inc. ("ADT"),

defendant, in November 2009.[1]  She alleged unlawful discrimination with respect to her

employment and subsequent termination from her position as a residential resale representative,

or "resale rep," selling home security system service.   In particular, plaintiff alleged

discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964,

codified, as amended, at 42 U.S.C. §§ 2000e *et seq.* (Count I);  discrimination on the basis of

race under 42 U.S.C. § 1981 (Count II); discrimination on the basis of sex, in violation of Title

VII (Count III); discrimination on the basis of national origin, also based on Title VII (Count

IV); a claim for retaliation under Title VII (Count V); and discrimination on the basis of age, in

violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*

(Count VI).

By a Memorandum Opinion (ECF 12) and Order (ECF 13) entered June 4, 2010, Judge

Richard D. Bennett granted ADT's motion to dismiss Counts I, III, and IV (*i.e.*, the substantive

discrimination claims under Title VII), but only "to the extent that those causes of action are

based upon [plaintiff's former supervisor Leonard] Gill's misconduct," ECF 12 at 6, which

---

[1] The case was reassigned to me on January 14, 2011.

allegedly occurred prior to Gill's resignation in December 2006.   Judge Bennett ruled that plaintiff had not filed a timely charge of discrimination concerning those allegations with the Equal Employment Opportunity Commission ("EEOC"), thereby failing to fulfill a condition precedent to maintenance of a Title VII lawsuit.[2]

The following claims remain:  plaintiff's racial discrimination claim under § 1981 (Count II);[3] her retaliation claim under Title VII (Count V); an ADEA claim (Count VI); and Title VII discrimination claims, based on alleged misconduct that occurred after June 21, 2007 (Counts I, III, and IV).

The parties have filed cross-motions for summary judgment, which have been fully briefed.  *See* ADT's motion for summary judgment (ECF 46) and supporting memorandum (ECF

---

[2] Although Judge Bennett's Order (ECF 13) stated that ADT's motion to dismiss was "GRANTED as to Counts I, III and IV," ADT does not dispute that Judge Bennett dismissed those counts only with respect to discriminatory acts allegedly committed by Gill, and did not adjudicate Counts I, III and IV to the extent that they alleged misconduct by other ADT personnel occurring after June 21, 2007, including plaintiff's firing by another supervisor, Robert Glazier, in September 2007.  *See* ECF 46-1 at 1.  In his Order, Judge Bennett also granted plaintiff leave to file an amended complaint as to her ADEA claim (Count VI), which plaintiff did.  *See* Amended Complaint (ECF 14).  Subsequently, plaintiff filed a Second Amended Complaint (ECF 21), in which she amplified her Title VII allegations with respect to Glazier.

[3] Unlike plaintiff's Title VII claims, Judge Bennett stated that plaintiff's § 1981 allegations were not time-barred because, "'[i]n Maryland, the statute of limitations for employment discrimination suits brought under 42 U.S.C. § 1981 is three years.'"  Memorandum Opinion at 6 n.2 (quoting *Ingram v. Balt. Gas & Elec. Co.*, Civ. No. CCB-02-2869, 2004 U.S. Dist. LEXIS 2853, at *7 (D. Md. Feb. 25, 2004)).  Because plaintiff's § 1981 claim does not concern discrimination in the formation of her employment contract, but rather post-formation discrimination, it appears that the applicable statute of limitations is, in fact, the four-year period provided by 28 U.S.C. § 1658, rather than the three-year statute of limitations under state law.  *See Jones v. Circuit City Stores, Inc.*, 370 F.3d 417, 420-21 (4th Cir. 2004) (applying § 1658 to claims of post-contract-formation employment discrimination under § 1981); *Jenkins v. Gaylord Entertainment Co.*, ___ F. Supp. 2d ___, 2012 WL 11001, at *2-3 (D. Md. Jan. 3, 2012) (applying § 1658 to retaliation claim under § 1981).  In any event, ADT has not argued for summary judgment on the basis of the affirmative defense of limitations.  *See, e.g.*, *Eriline Co. S.A. v. Johnson*, 550 F.3d 648, 653 (2006) ("[T]he statute of limitations is an affirmative defense, meaning that the defendant generally bears the burden of affirmatively pleading its existence.").

46-1) (collectively, "ADT Motion"); plaintiff's combined response in opposition and cross-motion for summary judgment (ECF 56) and her supporting memorandum (ECF 56-2) (collectively, "Mandengue Motion"); and ADT's combined reply in support of its motion and opposition to plaintiff's cross-motion ("ADT Reply") (ECF 61).   No hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I will grant in part and deny in part ADT's motion for summary judgment, and deny plaintiff's motion.  In particular, summary judgment will be denied to both parties with respect to plaintiff's § 1981 claims under Count II, to the extent that those claims are based on the actions of Leonard Gill, plaintiff's former supervisor.  ADT will be awarded summary judgment as to all other counts.

## Background[4]

Ms. Mandengue is a black woman whose country of origin is Cameroon, West Africa.  Mandengue Motion at 2.  Born in 1958, she was 49 years of age in 2007, when her employment with ADT as a "resale rep" was terminated.  Second Amended Complaint ¶¶ 162-63.

### A.  The Position of "Resale Rep"

The position of resale rep entails contacting homeowners who have out-of-service ADT home security systems already installed in their homes, and securing new contracts for reactivated service with those customers.  *See* Deposition of Robert Glazier at 12 ("Glazier Dep.").[5]  With the exception of a modest "stipend" for automobile usage, *see* Ex.2 to Deposition

---

[4] The facts set forth in this section are undisputed, unless otherwise noted.  Some facts are drawn from a "Declaration" of Mandengue, which she submitted with her motion.  *See* Ex.26 to Mandengue Motion ("Mandengue Decl.").  In its reply, ADT contends that the Declaration should be stricken.  As I shall explain in the discussion, I reject ADT's arguments.

[5] Excerpts of Mr. Glazier's deposition were submitted as exhibits by both parties.  *See* Ex.B to ADT Motion (ECF 46-3); Ex.25 to Mandengue Motion.  I have cited to the pagination of the deposition transcript, without reference to which exhibit(s) included the particular excerpt.

of Eleonore Mandengue at 2 ("Mandengue Dep."),[6] and a "training wage" paid on a "decelerating scale" during the first sixteen weeks of employment, Ex.1 to Mandengue Dep. at 1, ADT compensates resale reps strictly on the basis of sales commissions. *See* Ex.2 & 3 to Mandengue Dep. Sales commissions are not fully earned by a resale rep until the ADT system is fully installed and/or reactivated in the customer's home. *See* Ex.2 & 3 to Mandengue Dep. Consequently, although resale reps receive advances of commissions at the time a contract is completed, the advances are "charged back" if the sale is not completed. *See* Ex.2 & 3 to Mandengue Dep.

Because resale reps work based on commission, and often are required to meet with customers during non-traditional work hours, resale reps do not have fixed office hours. *See, e.g.*, Mandengue Dep. at 123; Glazier Dep. at 38. However, the position of resale rep is considered a full-time position. *See* Mandengue Dep. at 60.

Each ADT resale rep is given an annual quota of new reactivation contracts that the resale rep is expected to procure. *See id.*; *see also* Affidavit of Robert Glazier ¶ 4 ("Glazier Aff."), Ex.C to ADT Motion (ECF 46-4). At some point during Mandengue's employment, ADT apparently changed the formal basis on which quotas were calculated from a dollar amount of sales, Ex.2 to Mandengue Dep. at 3, to a number of "Units" (*i.e.*, newly reactivated service contracts). *See* Ex.3 to Mandengue Dep. at 3. However, both methods of calculating the quota

---

[6] Both parties also submitted excerpts from Ms. Mandengue's deposition, which occurred on March 18 and May 2, 2011. *See* Ex.A to ADT Motion (ECF 46-2); Ex.24 to Mandengue Motion; Ex.1 to ADT Reply (ECF 61-1). As with Glazier's deposition, I have cited to the pagination of the transcript of Mandengue's deposition, without reference to which party submitted the relevant excerpt. Additionally, along with the excerpts from Mandengue's deposition that ADT submitted, ADT provided several of the exhibits introduced at the deposition. *See* Ex.A & G to ADT Motion (ECF 46-2, 48). I will refer to these exhibits by the exhibit numbers assigned at the deposition. Some of these exhibits were filed under seal, because they contain proprietary business information of ADT. I discuss the content of the sealed exhibits only to the extent necessary for resolution of the motions.

produced the same practical result: resale reps were expected to produce approximately sixteen new contracts per month. *See* Ex.2 to Mandengue Dep. at 3; Ex.3 to Mandengue Dep. at 3; Glazier Aff. ¶ 4. ADT expects resale reps to "perform at 100% to quota." Ex.3 to Mandengue Dep. at 3; *see also* Glazier Aff. ¶ 4. ADT management ordinarily institutes "disciplinary counseling" for resale reps who "are consistently below 80% to quota." Glazier Aff. ¶ 4.

ADT makes several software tools available to resale reps for the purpose of identifying potential customers. The two most prominent of these software tools are "Telemar" and "ASAP." *See, e.g.*, Glazier Dep. at 27-31.

The Telemar system generates appointments for resale reps with customers who have requested reactivation of their home security system (either as a result of calling ADT, or contact from an ADT telemarketer). *See id.* at 29. In Telemar, each customer appointment, or "lead," is assigned to a particular resale rep based on the rep's assigned geographical region and "lead rotation," which refers to the rate at which resale reps receive Telemar appointments. *Id.* at 28. Each rep's "lead rotation" is expressed as a ratio. For example, according to Paula Godbee, the Field Support Data Team Manager for ADT's National Sales Center, who is responsible for managing the Telemar system, a "2:1 ratio provides that a Resale Rep will receive two leads for every one lead distributed to other Resale Reps in his or her sales unit." Affidavit of Paula Godbee ¶ 6 ("Godbee Aff."), Ex.E to ADT Motion (ECF 46-6). At his deposition, plaintiff's former supervisor, Robert Glazier, provided another example, Glazier Dep. at 29:

> One-to-one means Ruben—first appointment that comes through, Ruben would get one, whoever the next one is alphabetically, he would get one. And then if Veloso was next, she would get the next lead that the customer called in. And then if Bill Toppi was next, he would get the next one. So it's a—each rep gets one lead before it goes on to the next rep, and then when it comes around full circle again, that rep gets one lead.

Each local supervisor, or "resale manager," is responsible for establishing the "lead rotation" ratio for each resale rep in the supervisor's sales unit.  Godbee Aff. ¶ 6; *see also* Glazier Aff. ¶ 7.  Resale reps ordinarily are placed on a 1:1 lead rotation initially, but a resale rep's lead rotation may be adjusted by the rep's resale manager.  *See* Glazier Aff. ¶ 7-8; Godbee Aff. ¶ 7. Each resale manager is responsible for maintaining an overall sales quota for the sales unit he or she supervises, and has the discretion to "raise or lower a Resale Rep's lead rotation as needed to effectively manage the Resale Manager's required sales quota."  Godbee Aff. ¶ 7.[7]  For instance, a resale manager may lower the Telemar lead rotation of a resale rep who is not achieving his or her monthly sales quota.  *Id.* ¶ 8.  A resale manager also has the capability to reassign a Telemar-generated appointment to another resale rep after it has been initially distributed to a resale rep via the lead rotation system.  *See* Mandengue Dep. at 91.

Telemar obviously is a valuable source of leads for ADT resale reps, because a lead generated through Telemar is, by definition, a lead for a customer who has already expressed interest in having an ADT security system reactivated.  However, according to Godbee, resale reps typically do not receive more than five Telemar leads each month.  *Id.* ¶ 9.  Thus, resale reps must also utilize other methods to achieve their quota of approximately sixteen sales per month. The ASAP system is another source of leads.

ASAP is a database of customers with out-of-service ADT accounts.  *See* Glazier Dep. at 31.[8]  Unlike leads in Telemar, leads in ASAP are not assigned on a "lead rotation" basis.  Rather, a resale manager distributes the various leads in the pool of leads for a given geographic area

---

[7] Personnel at ADT's National Sales Center make any actual adjustments to a resale rep's lead rotation, but do so at the direction of the local supervisor.  Godbee Aff. ¶ 9.

[8] One particularly valuable subgroup of leads within the ASAP system is so-called "New Movers," who are people who have recently relocated to a residence that has an inactive ADT security system installed.  Glazier Aff. ¶ 11.  New Movers are considered "prime candidates" for reactivation by resale reps.  *Id.*

among his or her resale reps.  *See* Glazier Dep. at 31.   However, the distribution is not necessarily even.  The resale manager has the authority to redistribute leads among resale reps. At his deposition, Glazier explained a circumstance in which a resale manager might redistribute ASAP leads, Glazier Dep. at 76-77:

> If a rep is not using leads—if ADT gives 400 leads to a rep and they're not using them, not signing into them . . . .  If you're underusing ASAP, the system we give you, and you're only using it Monday and Tuesday, say, and I have 300 leads of mine, ADT leads are sitting there, I will reallocate them to a rep that is working them, sure.  Because those are leads that are not being sold unless they're in front of somebody who is going to work them.

Resale reps are able to log in to the ASAP system from a computer at ADT's office or remotely, and are expected to log in regularly in order to obtain customer leads.  *See* Glazier Dep. at 30.

According to Glazier, despite the use of Telemar and ASAP, resale reps "generally cannot meet their production quota by only selling the leads distributed by ADT telemarketing resources such as Telemar.  Resale Reps are required to independently identify potential ADT customers and generate their own leads."  Glazier Aff. ¶  5.  Before Glazier became a resale manager, he was a resale rep.  He recounted a variety of methods he used to achieve his monthly quota as a resale rep, *id.* ¶ 6:

> My efforts to generate my own leads included, but were not limited to, writing letters to potential customers; making visits in neighborhoods to out of service ADT accounts; and using ADT resources such as ASAP and Mastermind, which is a[] system that allows all sales reps to research in service and out of service ADT accounts.

Resale reps also receive leads acquired by ADT from outside sources, which are distributed to resale reps by the resale manager.  *See* Mandengue Dep. at 89; ADT Motion at 8. Typically, in the Columbia, Maryland office where plaintiff worked, these leads were distributed at weekly "call night" meetings.  *See*, *e.g.*, Mandengue Decl. at 13.

### B.  Mandengue's Employment

*1.  Supervision by Jennifer Franey*

ADT hired Ms. Mandengue as a resale rep in December 2004, to work at its Columbia, Maryland office.   Plaintiff began a training period for the position in January 2005.   *See* Mandengue Dep. at 60.  At the time of hire, plaintiff's resale manager was Jennifer Franey, who had recruited Mandengue for the position at a job fair.  *Id.* at 25, 59-60.

Franey assigned Gill, who was a resale rep at that time and was the "team lead" for the sales unit, to train Ms. Mandengue and another new employee, Meredith Cole, who was white and "significantly younger" than Mandengue.  Mandengue Decl. at 1; *see also* Mandengue Dep. at 74.  The training lasted "a couple of weeks."  Mandengue Dep. at 73; *see also id.* at 76 (stating that the training lasted "more than a week").  According to Mandengue, throughout the training, Gill devoted more attention to Cole than to Mandengue.  For instance, at times Gill would inform Mandengue that her training was over for the day and that she should "go home," yet he would tell Cole, "Meredith . . . you have to stay because I have [a] couple of things that I have to show you." *Id.* at 79.  When Mandengue asked questions during the training, Gill did not answer, and instead told Mandengue, "after the training you should ask Meredith who understands better than you."  Mandengue Decl. at 2; *see also* Mandengue Dep. at 77.

Gill also "ridicul[ed]" Mandengue in front of Cole during the training, made fun of Mandengue's accent, Mandengue Dep. at 81, and made various derogatory and insulting comments to her.  For example, when Mandengue commented, "it's hot today," Gill responded, "for where you're coming from, you cannot complain about . . . the heat."  *Id.*  Gill also remarked: "[T]his job is not for a woman," and a "woman will not do good in this job and especially when they [are] older."  *Id.* at 83.

At least for purposes of the motions, ADT does not dispute that Gill made these or other alleged derogatory comments, described *infra*.  ADT has not submitted any evidence to rebut plaintiff's allegations regarding her treatment by Gill.

During the training period, Mandengue met with Franey to discuss Gill's treatment.  At the meeting, Franey told Mandengue that she was "glad [Mandengue] came to her," Mandengue Decl. at 2, because Franey had received a "negative report" about Mandengue from Gill. Mandengue Dep. at 77.  In particular, Franey told Mandengue that Gill had reported that Mandengue "could not do the job," and "didn't understand a thing."  Mandengue Decl. at 2. Thus, until Mandengue came to her, Franey had been preparing to terminate Mandengue's employment on the basis of Gill's reports.  *Id.*  Franey advised Mandengue to "be calm and continue to work without problems," *id.*, and "if there's any problem to come and tell her." Mandengue Dep. at 77.

On or about March 11, 2005, Franey registered Mandengue to receive appointments via Telemar, and placed Mandengue on a 1:1 lead rotation.  Godbee Aff. ¶ 10.  From March through August 2005, Mandengue generated approximately 100 new reactivation contracts with customers.  *See* Mandengue Dep. at 103.  Plaintiff's monthly performance varied during this time period; she exceeded her monthly sales quota in June 2005, but was below quota to varying degrees in other months.  *See* Ex.A to Affidavit of Jonah Serie ("Serie Aff."), Ex.D to ADT Motion (ECF 46-5) (chart of Mandengue's performance on the basis of "% To Quota" by month).  Specifically, Mandengue's monthly performance was as follows, *id.*:

| | |
|---|---|
| March 2005 | 92.75% to quota |
| April 2005 | 63.23% to quota |
| May 2005 | 26.83% to quota |
| June 2005 | 134.07% to quota |
| July 2005 | 96.87% to quota |

August 2005          62.60% to quota

In or about August 2005, Franey left her position as resale manager for ADT's Columbia office.  *See* Mandengue Decl. at 2.  The position of resale manager was vacant from August 2005 until February 2006.

*2. Supervisory Vacancy and Supervision by James Austin*

According to an affidavit of Tracy Aaron, ADT's Mid Atlantic Regional Human Resources Manager, in February 2006 James Austin began to "provide[] supervisory support as needed to the Columbia, Maryland ADT office."  Affidavit of Tracy Aaron ¶ 3 ("Aaron Aff."), Ex.F to ADT Motion (ECF 46-7).[9]  *See also* Mandengue Dep. at 131-32 ("[W]hen Jennifer [Franey] left . . . we didn't have any supervisor, . . . we were on our own. . . .   [S]o we have a period of vacancy for almost five or six . . . months.").  Austin provided supervision between February 2006 and April 2006.  *See* Aaron Aff. ¶ 3.

Between September 2005 and April 2006, plaintiff's sales performance was as follows:

September 2005     35.38% to quota

October 2005       44.54% to quota

November 2005      25.06% to quota

December 2005      30.10% to quota

January 2006       85.83% to quota

February 2006      43.59% to quota

March 2006         81.76% to quota

April 2006         36.61% to quota

*See* Ex.A to Serie Aff.

Mandengue partly attributes her poor sales production during this period to time she spent out of the office, from late October through some time in December 2005, to attend the

---

[9] According to Aaron's affidavit, Austin was a resale manager but, given Aaron's representation that Austin provided "supervisory support as needed," it is unclear whether Austin was primarily assigned to another office.  *See* Aaron Aff. ¶ 3.

funeral of a nephew who was killed in South Africa. *See* Mandengue Dep. at 145. This leave of absence was approved by an ADT human resources administrator. *Id.* In addition, plaintiff was no longer receiving leads that Franey previously distributed evenly to all resale reps at the weekly "call night," because the position of resale manager was vacant. *See id.* at 144.

On February 7, 2006, shortly after beginning supervision of the Columbia office, Austin placed Mandengue on a "Performance Improvement Plan." *See* Ex.10 to Mandengue Dep. ("2006 PIP"). According to the 2006 PIP, Mandengue's performance was "unsatisfactory" due to her "low quota" production. *Id.* The 2006 PIP called for Mandengue to spend "more time in the office to be trained on all systems to effectively perform her job," to "[a]ctivate and close customer[s] who were turned off for nonpay on the same day," and to "spend more time with other resale reps to get some new ideas on planning her day/week." *Id.* The 2006 PIP also provided that Austin would "meet every Thursday with Eleonore for training for at least (4hrs) [sic]," and required Mandengue to "come into the office '1-day a week' and spend time developing a game plan to increase her sales production." *Id.*

### 3.  Supervision by Leonard Gill

In April 2006, Austin was promoted to area sales manager, and Gill was promoted to resale manager for the Columbia office, supervising Mandengue and others. *See* Aaron Aff. ¶ 4; Mandengue Dep. at 148. According to Mandengue, Gill "hated" her, and frequently ridiculed her in front of other staff, including during staff meetings. Mandengue Decl. at 3.

At her deposition, Mandengue recounted an occasion on which Gill and an unnamed ADT employee were openly discussing her. She recalled that Gill "was talking about [Mandengue's] weight," saying that "he doesn't even know if [Mandengue] buy[s] all of [her] dresses," to which the other employee responded, "I don't even know . . . how she can be so

successful.  I don't even know how customer[s] can understand what she[']s saying with her accent.  I think she's having voodoo on them."  Mandengue Dep. at 116-17.  On other occasions, according to Mandengue, Gill attributed her "success" to "witchcraft" and "voodoo," and stated that, "as a woman and especially a black one, [Mandengue] will never be successful in the business."  Mandengue Decl. at 3.  Gill also commented: "Eleonore, from where you come from, you are not suppose to complain about here.  You lived in the jungle before."  *Id.* at 2 n.1.  Additionally, Gill ridiculed Mandengue's accent, and remarked that Mandengue "should go back to Cameroon."  *Id.* at 3.[10]

Gill allegedly took customer leads away from Mandengue, and refused to give her new leads.  *See* Mandengue Decl. at 3.  Mandengue also contends that Gill changed her lead rotation in Telemar, and reassigned her Telemar appointments to other resale reps.   Mandengue Decl. at 3.  According to ADT's data team manager, Godbee, in late November 2006 Gill "limited Ms. Mandengue's assigned territory in Telemar to only include customer leads in Baltimore." Godbee Aff. ¶ 10.  However, Godbee did not report whether Gill ever changed Mandengue's Telemar lead rotation.  *Id.*  In addition, Mandengue complains that, when she sought to take vacation time to attend her mother's funeral in Cameroon, Gill told her she would have to resign her position in order to receive her "vacation pay."  Mandengue Decl. ¶ 3.[11]

From May through December 2006, Mandengue's sales performance was as follows:

|  |  |
|---|---|
| May 2006 | 57.57% to quota |
| June 2006 | 51.66% to quota |

---

[10] Mandengue has not provided the dates of any of Gill's alleged comments, and some appear similar to comments Gill allegedly made during plaintiff's training with Meredith Cole in early 2005.  Gill's comments regarding "voodoo" are also quite similar to the comments allegedly made by another co-worker in conversation with Gill, quoted *supra*.  It is not clear whether Gill made similar comments on separate occasions, or whether plaintiff has alleged the same comments multiple times.

[11] Mandengue does not make clear the basis on which she was entitled to vacation pay.

| | |
|---|---|
| July 2006 | 49.02% to quota |
| August 2006 | 81.84% to quota |
| September 2006 | −1.02% to quota[12] |
| October 2006 | 7.00% to quota |
| November 2006 | 43.33% to quota |
| December 2006 | 23.21% to quota |

*See* Ex.A to Serie Aff.

In December 2006, Gill resigned as resale manager. *See* Mandengue Dep. at 163.[13]

### 4. Supervision by Jonah Serie

For approximately two months in January and February 2007, the position of resale manager was vacant, and Jonah Serie, who had succeeded James Austin as the area sales manager, assumed responsibility for providing "supervisory support" to the resale reps in the Columbia office. Serie Aff. ¶ 4.

On February 6, 2007, Mandengue completed a "Performance and Behavior Assessment," Ex.12 to Mandengue Dep., in which she acknowledged: "My performance was not positive according to my numbers.  But, this was due to the time off of work."  Under the section of the Assessment form labeled "Manages Diversity," Mandengue also stated: "Diversity is like a tool to me.  I am in ease with diversity."  *Id.*  ADT observes that Mandengue "did not note on this evaluation that she had allegedly been discriminated against or harassed by Mr. Gill, and she did not state on the form that her low sales production was somehow influenced by any alleged acts

---

[12] Neither party has explained the circumstances that can result in a resale rep achieving a negative sales figure for a given month.

[13] It is not clear whether Gill transferred to a different position with ADT or left the company.  ADT asserts that Gill "accepted a different position with ADT at the end of 2006," ADT Motion at 10, and cites Mandengue's deposition to support that assertion.  However, plaintiff simply testified that Gill "left in December 2006."  Mandengue Dep. at 163.  Moreover, Glazier, who became resale manager a few months later, in March 2007, testified that he "never met" Gill.  Glazier Dep. at 9, 16.

of discrimination or harassment by Mr. Gill." ADT Motion at 11. Although the Assessment form does not contain a dedicated section for such reporting, ADT maintains that Mandengue "could have done so." *Id.*

Shortly thereafter, in mid February 2007, Mandengue applied for a part-time sales job at Macy's department store. *See* Mandengue Dep. at 246. She began working at Macy's in March 2007. *Id.* at 256. Mandengue did not inform any ADT supervisor about her job at Macy's, although she contends that she was not obligated to do so. *Id.*

During January 2007, Mandengue produced sales of 38.46% to quota, and in February 2007 produced sales of 37.50% to quota. *See* Ex.A to Glazier Dep.

### 5. Supervision by Robert Glazier

In March 2007, Robert Glazier became the resale manager in the Columbia office. *See* Glazier Dep. at 9. For approximately a week in late March and early April 2007, Glazier increased Mandengue's lead rotation in Telemar to 2:1. Godbee Aff. ¶ 10. In April and May 2007, Glazier reviewed Mandengue's low sales quota numbers and scheduled one-on-one training sessions with Mandengue. Glazier Dep. at 41-42. In Glazier's opinion, Mandengue was "receptive" to the training, *id.* at 42, but he felt that Mandengue "wasn't dedicating the time necessary to be successful." *Id.* at 46. As Glazier saw it, "if you treat it as a part-time job, you're going to get part-time numbers." *Id.* at 46-47. He was also critical of Mandengue's limited evening and weekend availability because, in his experience, customers tended to be more receptive and available for appointments in evenings and on Saturdays. *Id.* at 47.

In her Declaration, at 6, Mandengue averred: "After Robert Glazier came, I started seeing Len Gill's behavior in Robert." She recounted at her deposition some occasions when Glazier allegedly made negative comments to her, although she did not provide specific dates for several

of the incidents.  She alleged that on one occasion Glazier made her the "center of attention" at a staff meeting, and discussed the "way [she] talk[s]" and her "performance."  Mandengue Dep. at 166-67.   On another occasion, he allegedly commented on Mandengue's age, stating: "[S]ometime in this business . . . you depend on younger people can understand [sic], you know, so they learn quicker."  *Id.* at 287.

According to Mandengue, at some point she "confronted" Glazier about his "behavior," but Glazier "denied doing anything on purpose and [said that] if he did, it wasn't intentional."  Mandengue Decl. at 6.  Although Mandengue "gave him the benefit of the doubt," Glazier's behavior "continued."  *Id.*   Therefore, plaintiff spoke with Bonnie Harris, ADT's Regional Manager for Human Resources, and "told [Harris] everything that had been going on."  *Id*.  Harris spoke with Glazier in June 2007.   Thereafter, Glazier "came to [Mandengue] and apologized for any misunderstanding as he called it."  *Id*.  He also completed and delivered to Mandengue a "Coaching for Improvement" ("CFI") form.  *See* Ex.1 to Glazier Dep.  According to Mandengue, Glazier told her that the CFI was "something that would make us work together without any problems in the future," and did not "have any disciplinary effect, rather, it is just for both of us for our own accountability."  Mandengue Decl. at 6.

The CFI provided, *inter alia*, that Mandengue was expected to be at a "minimum of 75% to quota for the month of June," and had to be at the ADT office five days a week.  Additionally, Glazier wrote that he "will, as always, in person, or by phone, be ready to support you in any way possible to help you reach your goal." *Id.*  Mandengue signed the CFI, although she asserted in her Declaration that Glazier misled her into doing so, by representing that the CFI did not have a "disciplinary effect."  Mandengue Decl. at 6.

Mandengue performed only 46.15% to quota during June 2007.  *See* Ex.A to Serie Aff. In early July 2007, Glazier drafted, and Mandengue signed, a Performance Improvement Plan. *See* Ex.2 to Glazier Dep. ("July 2007 PIP").  The July 2007 PIP stated, *inter alia*, that, "[b]ased on a CFI signed on 06/12/07, it was agreed that 75% for the month of June would be attained. It was not met."  *Id.*  It also said: "You have been tardy to several meetings and training sessions." *Id.*  Moreover, it characterized Mandengue's performance as "unsatisfactory," specifically noting Mandengue's organizational issues and failure to follow instructions properly.  *Id.*  Finally, the July 2007 PIP stated that Mandengue "must be at 100% MTD for the month of July, by July 27th."  *Id.*  During July 2007, Mandengue's sales performance was 62.54% to quota.

Plaintiff contends that she continued to be subjected to disparate treatment by Glazier. He recruited Maria Tess Veloso, described by plaintiff as a "white (Asian) female,"[14] and made comments to the effect that he would ensure that "Tess will be [at] 100% each month." Mandengue Decl. at 7.[15]  Mandengue also contends that a white resale rep, Bill Toppi, went on vacation for three weeks and was able to achieve over 100% to quota performance in less than five days, which Mandengue views as evidence of discrimination.  *See* Mandengue Decl. at 7. She also contends that Glazier provided all of the resale reps except for her with a "new marketing tool," which consisted of "reactivation postcards" to mail to potential customers.  *Id.* at 7 n.5.[16]  Mandengue alleges that she "confronted Robert" about her "unfavorable treatment," and asked him why she "was the only one under [her] numbers" but was not "receiving any

_____

[14] According to ADT's human resources records, Veloso is Asian, and approximately eight years older than Mandengue.  Aaron Aff. ¶ 5.

[15] Glazier specifically denies making such a comment.  Glazier Dep. at 75.

[16] Mandengue submitted a reactivation postcard as an exhibit.  *See* Ex.8b to Mandengue Motion.  Referring to an inactive ADT security system, the postcard asks the potential customer: "You Have It, Why Not Use It?"  *Id.*

help" from Glazier. *Id.* at 8.   According to Mandengue, Glazier "never offered [her] an explanation." *Id.*

During the months of July and August 2007, Mandengue had several medical appointments. *See* Ex.23 to Mandengue Motion (appointment slips and receipts).   She claims that, while at ADT, her "health took a very bad turn," which she attributes to the way in which she was treated by Glazier and Gill.   Mandengue Decl. at 18.   According to plaintiff, on one occasion she "almost had a heart attack." *Id.*   At one of her hospital visits, she was diagnosed with "chest pain, uncertain cause," Ex.25 to Mandengue Motion, although cardiac issues ultimately were ruled out. *Id.*

Mandengue claims that she met with Glazier in his office in August 2007, and that he told her that September 2007 would be her last month at ADT, and that he had given a report to that effect to Regional Human Resources Director Bonnie Harris.   Mandengue Decl. at 8. Mandengue alleges that she then "went to see Bonnie Harris," who "denied Robert's allegations, and told [her] that she did not know what he was talking about." *Id.*   In response, Harris organized a meeting between Harris, Mandengue, and Glazier on August 14, 2007.

At this meeting, Mandengue addressed her concerns that Glazier was cancelling her leads and appointments without her knowledge, lowering her Telemar lead rotation, and giving leads to other resale reps. *See* Mandengue Decl. at 9-10.   According to Mandengue, Glazier "responded and said he is the master of the Department, and that he can do what he wants," and that "it was his prerogative to remove people from Telemar, and also to take away appointments from one Rep and given them to who he wants." *Id.* at 10.   She contends that Glazier also asserted that he was giving her business to others because of customer complaints, although he could not remember specific complaints. *Id.*   In response, Harris instructed him to keep a log of

any complaints regarding Mandengue.  *Id.*

On August 18, 2007, Glazier emailed Mandengue, asking her to "[p]lease sign into ASAP today. It's been 3 weeks since you have signed into ASAP." Ex.12 to Mandengue Motion. Mandengue responded, "Robert, I will try to work again in ASAP, but I [sic] really discouraged with everything that is going on; and especially after our meeting with HR."  *Id.*

Mandengue alleges that Glazier reassigned several other customers from her to other resale reps, with no notice or explanation.  These included customers Tracy Ko, Anita Brown, and Barbara Rosati.  *See* Mandengue Decl. at 11.[17]

On or about August 27, 2007, Mandengue discovered that Glazier had reassigned one of her customers, Louise Howard, to an African-American resale rep, Christopher Frazier.  *See* Mandengue Decl. at 16; *see also* Glazier Aff. ¶ 15 (stating that Frazier is African-American). According to Mandengue, she had met with Howard at her house on July 20, 2007, to sign a contract to reactivate Howard's security system.  *See* Mandengue Decl. at 16.  The security

---

[17]  ADT's National Sales Center "tracks customer contact, sale and ADT installation transactions."  Godbee Aff. ¶ 12.  Godbee averred that customers Ko, Brown, and Rosati are "representative instances in which Ms. Mandengue had some initial customer contact but ultimately did not earn a commission related to the sale and installation of the ADT unit at issue." *Id.*  She described the circumstances of each customer, *id.*:

Customer Arnita [sic] Brown was a lead initially distributed to Resale Rep Danny Brown in Telemar and then reassigned to Ms. Mandengue.  Ms. Mandengue visited Ms. Brown and conducted a field sale on or about April 12, 2007.  Ms. Brown ultimately canceled her contract.  Accordingly, no commission was earned by Ms. Mandengue related to Ms. Brown.

Ms. Mandengue contacted customer Barbara Rosatti [sic] on or about July 24, 2007.  The installation was cancelled and rescheduled on approximately six separate occasions.  Peter Burke, a former ADT technician, ultimately completed a new contract with the customer and reactivated the ADT system.

Customer Tracy Tran Ko was initially contacted by the corporate phone sale office as the customer requested an online activation of her ADT system. While [Mandengue] also contacted Ms. Ko on or about July 29, 2007, and set up an installation, Ms. Ko cancelled the installation and no sale was completed.

system had been damaged by a storm, and reinstallation of the system was necessary, which would be covered by Howard's insurance. *Id.* Accordingly, Mandengue had agreed with Howard to delay the installation date until Howard received a check from her insurer. *Id.* Later, when Mandengue "called Mrs. Howard to see what was holding up the insurance payment," she learned that another resale rep had completed the contract and installed the system. *Id.* Mandengue spoke with Frazier, who confirmed that Glazier had "told him to go there and write the contract, and do the installation immediately," and that Frazier had not known that Howard was Mandengue's customer. *Id.* at 18.

Mandengue sent an email to Glazier on August 27, 2007, complaining about the reassignment of Howard's contract, asking, "[s]hould [sic] not make sense to let me know when a customer of mine has a complain [sic] than sending another rep to rewrite the job without my knowledge. I think it does; especially when you are struggling and you do not receive any help from your boss." Ex.21 to Mandengue Motion. Mandengue recapitulated her complaints, including "[c]ancelling . . . jobs," "taking . . . appointments away . . . and giving them to who you want," "[t]aking me out of Telemar or putting me in a rotation of 1 to 5 or 1 to 10," "[g]etting into my ASAP and pulling out my leads," and "[s]aying all kind of negative remark toward me in from of anybody." *Id.* Mandengue concluded by describing her work environment as "pure Hell" and telling Glazier that he was "killing [her]." *Id.*

Glazier conceded at his deposition that he "might" have reassigned customers from Mandengue to other resale reps. Nevertheless, he confirmed that he had the "ability" to do so and had done so "on occasion to reassign a lead in the best interest of a customer." Glazier Dep. at 82. Glazier also admitted that he had reassigned Howard to Frazier, but contended that he did so because the "customer was not getting return phone calls and wasn't getting her installation

done quick enough.  So I reassigned the lead to a rep that could get the customer installed as soon as possible." Glazier Dep. at 85.  In contradiction to Mandengue, Glazier also alleged that he told Mandengue that he had reassigned Howard's account "[p]robably right after [he] got off the phone with the customer." *Id.* at 86.

At a meeting on September 4, 2007, Glazier and Harris attempted to convince Mandengue to sign a new Performance Improvement Plan, but Mandengue refused to do so.  *See* Mandengue Decl. at 12; *see also* Ex.3 to Glazier Dep. ("September 2007 PIP").  The September 2007 PIP would have required Mandengue, *inter alia*, to access ASAP daily, and to be at 100% to quota for September 2007.  During the meeting, Bonnie Harris said to Mandengue: "[E]ven if you d[o] not sign it, that doesn't mean it will not apply to you." *Id.*

The meeting of September 4, 2007, took place on a "call night."  Mandengue Decl. at 13. That evening, to Mandengue's "surprise," Glazier gave her four new leads.  *Id.*  However, no sales resulted from the leads because they were "dead leads": either they had already been sold or the customers had no interest.  *Id.*  On September 10, 2007, Glazier increased Mandengue's lead rotation in Telemar to 2:1.  *See* Godbee Aff. ¶ 10.  Later in September, however, Glazier reduced Mandengue's leads in ASAP.  According to Mandengue, she "went from more than 400 leads to 108 leads." *Id.*  At his deposition, Glazier acknowledged reassigning Mandengue's ASAP leads, explaining: "There were several hundred leads in there not being worked that had a lot of age on them, meaning they're just not going anywhere, not being worked."  Glazier Dep. at 102.

On September 26, 2007, Glazier and Serie fired Mandengue and called police to escort her from ADT's Columbia office.  Mandengue Decl. at 14; Serie Aff. ¶ 12.  According to Serie,

Mandengue "was terminated for poor attendance and failure to meet the performance standard set forth in several written performance improvement plans."  Serie Aff. ¶ 12.

Between March 2007 and September 2007, while Glazier was plaintiff's supervisor, Mandengue's sales performance was as follows, Ex.A to Serie Aff.:

| | |
|---|---|
| March 2007 | 30.77% to quota |
| April 2007 | 69.23% to quota |
| May 2007 | 25.00% to quota |
| June 2007 | 46.15% to quota |
| July 2007 | 61.54% to quota |
| August 2007 | 6.25% to quota |
| September 2007 | 30.00% to quota |

As noted, plaintiff began working at Macy's in March 2007.  During most weeks between March 2007 and September 2007, Mandengue worked approximately ten to twenty-two hours per week at the store.  Mandengue maintains that her employment at Macy's did not interfere with her work at ADT.  *See* Mandengue Dep. at 256.  However, Glazier was not aware of that employment.  *See* Ex.15 to Mandengue Dep. at 22.

Additional facts will be included in the discussion.

## Discussion

### A.  Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When more than one party has filed a motion for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether [any] of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). All of the "motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2010 Supp.).

Although Mandengue has titled her submission as a "Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Her Cross Motion for Summary

Judgment," her motion does not contain any argument in support of judgment in her favor. Rather, as ADT points out, ADT Reply at 1 n.1, the Mandengue Motion consists solely of argument that "genuine issues of material fact exist in the instant matter," Mandengue Motion at 1, and, because of the dispute of material facts, ADT is not entitled to summary judgment. Most of the Mandengue Motion is devoted to setting forth plaintiff's version of the facts, including restating, *verbatim*, the content of her Declaration, which is attached as Exhibit 25 to her motion. Indeed, her entire legal argument is contained in five paragraphs in her motion, quoted below:

> Plaintiff disputes all of Defendant's assertions as delineated in dispositive motion [sic]. Defendant has not met its burden pursuant to Fed. R. Civ. P. 56. Defendant's motion requires more scrutiny than Plaintiff's response in opposition, to determine whether the moving party has satisfied its burden. Furthermore, the burden is on the movant at all times despite the fact that the plaintiff ultimately has the burden of proof in establishing his claim.

> Plaintiff denies any charges of lack of performance as alleged by Defendant, and disputes his version of events. It is her position that while working within the parameters of her position as a Residential Specialist in ADT's Resale Department for three (3) years with Respondent, that she has performed her duties with satisfactorily [sic], and that her attempts to execute her duties pursuant to the policies, procedures and customs within her department were stifled through the impermissible actions of Defendant.

> In the case *sub judice*, there are significant questions concerning Defendant's actions toward Plaintiff that commenced during her training in early 2005, and continued through her unwarranted termination in September 2008. The parties dispute each other on every point concerning Plaintiff's performance, as evidenced by Mandengue and Glazier's deposition testimony.

> Plaintiff proffers more than mere allegations, she proffers her own deposition testimony, along with affidavits and exhibits, in support of her claims. The Court must view the factual evidence, and all justifiable inferences drawn therefrom, in the light most favorable to the non-moving party.
>
> *   *   *
>
> At bar, Plaintiff proffers proof of her performance through her exhibits which highlight how her performance was manipulated by Defendant's actions in the workplace. Mandengue testifies that her performance was adversely impacted when her "leads" were reduced or manipulated to discount her performance, and that she was treated less favorably than coworkers outside of her protected classes of race, sex, national origin and age, as well as, retaliation.

Mandengue Motion at 27-30 (internal citations omitted).

Plainly, these arguments suggest a dispute of material facts, so as to defeat summary judgment for either party.  They do not establish, if accepted, that plaintiff is entitled to judgment as a matter of law.  Accordingly, plaintiff's motion for summary judgment will be denied in all respects.  I will discuss plaintiff's contentions, as well as the arguments presented in the ADT Motion, in the discussion that follows.

### B.  Employment Discrimination – Methods of Proof

In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc).  The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted).  "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'"  *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[18]

_____

[18] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII. However, the burden-shifting methodology it endorsed has been adapted for use in cases of alleged discrimination in other statutory contexts.  *See, e.g.*, *Lightner v. City of Wilmington*, 545 F.3d 260, 263 n.* (4th Cir. 2008) ("[T]he *McDonnell Douglas* framework applies to discrimination claims under . . . § 1981."); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (en banc) (applying *McDonnell Douglas* framework to employee's claim of age discrimination under ADEA).  *But see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, ___, 129 S. Ct. 2343, 2349 n.2 (2009) (observing that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context").

The *McDonnell Douglas* scheme was created to resolve "the proper order and nature of proof" of discrimination at trial. *McDonnell Douglas*, 411 U.S. at 793. The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion . . . never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

If the employee plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).[19]

If the plaintiff establishes a prima facie case, by a preponderance of the evidence, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries

---

[19] In *McDonnell Douglas,* the prima facie case of racial discrimination in hiring was formulated as follows, 411 U.S. at 802:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

When the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. *See also Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

On the other hand, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," and the plaintiff has proved a prima facie case, "the court must award judgment to the plaintiff as a matter of law," *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original), because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3.[20] *See Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a

---

[20] In *St. Mary's Honor Center*, the Supreme Court concluded that, where the employer meets its burden of producing evidence of legitimate reasons for its adverse action, but the fact-

presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) ("[T]he '[c]onventional rul[e] of civil litigation [that] generally appl[ies] in Title VII cases' . . . requires a plaintiff to prove his case 'by a preponderance of the evidence,' using 'direct or circumstantial evidence.'") (internal citations omitted) (alterations in original). The purpose of the prima facie case requirement is to assist the plaintiff in surmounting two common "evidentiary obstacles": (1) that "'direct evidence of discrimination is likely to be unavailable'"; and (2) that "'the employer has the best access to the reasons that prompted him to fire, reject, discipline or refuse to promote'" the employee. *Smith v. Univ. of North Carolina at Chapel Hill*, 632 F.2d 316, 334 (4th Cir. 1980) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("[T]he entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by.").

---

finder disbelieves all of the employer's proffered reasons, judgment for the plaintiff is permitted, but not mandatory, in that situation. The Court explained:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, "[n]o additional proof of discrimination is *required*. . . ." But . . . holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle . . . that a presumption does not shift the burden of proof, and ignores our repeated admonition that the . . . plaintiff at all times bears the "ultimate burden of persuasion."

509 U.S. at 511 (internal citations and footnote omitted; emphasis in original)

Therefore, the plaintiff is not required to present evidence of discriminatory intent in the prima facie case.  Nor is the plaintiff required to "exclude every hypothetical reason for the defendant's action toward him."  *Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 643 (4th Cir. 1978).  Rather, the prima facie case "serves [the] important function" of "eliminat[ing] the most common nondiscriminatory reasons for the plaintiff's rejection," *Burdine*, 450 U.S. at 253-54, which "are (1) 'lack of qualification' or (2) 'elimination of the job.'"  *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citation omitted).  The rationale of the *McDonnell Douglas* approach is that, if a plaintiff proves a prima facie case, and the defendant submits no evidence of any legitimate basis for its actions, the court or fact finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."  *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978).

The relevance of the *McDonnell Douglas* scheme outside of the trial context is limited, however.  "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination" under *McDonnell Douglas* to survive a motion to dismiss.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007).  And, application of the *McDonnell Douglas* test at the summary judgment stage is a thorny issue.  The Fourth Circuit has admonished the district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'"  *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted).

The Court of Appeals for the District of Columbia Circuit has bluntly stated that, in considering an employer's motion for summary judgment, "the prima facie case is a largely unnecessary sideshow" in the vast majority of cases, and that "judicial inquiry into the prima facie case is usually misplaced." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008). Writing for that court, Judge Kavanaugh explained, *id.* (emphasis in original):

> [B]y the time the district court considers an employer's motion for summary judgment . . . the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision—for example, through a declaration, deposition, or other testimony from the employer's decisionmaker. That's important because once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is "no longer relevant" and thus "disappear[s]" and "drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).
>
> *   *   *
>
> Lest there be any lingering uncertainty, we state the rule clearly: In a [discrimination] suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment . . . in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [a protected classification]?

The Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*,'" and that, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination." *Merritt*, *supra*, 601 F.3d at 294-95 (citation omitted). Moreover, it is a common practice of the Fourth Circuit to assume, without deciding, that the plaintiff has established a prima facie case in cases where the employer has proffered evidence of a legitimate reason for its adverse action in

- 29 -

its motion for summary judgment.  *See, e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

## C.  Mandengue's Declaration

As mentioned, *see* note 4, *supra*, ADT contends in its reply that Mandengue's Declaration should be stricken on three grounds.  First, ADT argues that several of Mandengue's assertions in the Declaration materially contradict her prior deposition testimony, and thus violate the "sham affidavit rule."  Second, ADT argues that other assertions in the Declaration constitute inadmissible hearsay.  Finally, ADT argues that the remainder of the Declaration consists of conclusory allegations that merely repeat the contentions of Mandengue's complaint. As I shall explain, I reject ADT's contentions.

The "sham affidavit rule" was initially articulated by the Second Circuit in *Perma Research & Development Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969).  The *Perma* Court considered an affidavit in which Perma's president averred that a representative of Singer had told him that Singer never had any intention of performing on the contract at issue in the case. *See id.* at 577.  At summary judgment, Perma advanced the affidavit of this conversation as evidence of Singer's fraud.  However, Perma's president had not previously mentioned the alleged conversation in four days of deposition testimony, in which he had been directly questioned as to any evidence he possessed of Singer's intention not to perform the contract.  *Id.* The Second Circuit affirmed the trial court's entry of summary judgment in favor of the

defendant, stating that the trial court "could properly conclude that the statement made in the affidavit was less reliable than the contradictory statements in the deposition, and that it did not raise a triable issue of fraud." *Id.* (internal citation omitted). It reasoned: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 578.

The Fourth Circuit adopted the rationale of *Perma* in *Barwick v. Celotex Corp.*, 736 F.3d 946, 960 (4th Cir. 1984), reasoning that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Later, in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the Supreme Court provided the following formulation of the sham affidavit rule, stating: "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that *flatly contradicts* that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Id.* at 806 (emphasis added).[21] Similarly, in *Pittman v. Atlantic Realty Co.*, 359 Md. 513, 754 A.2d 1030 (2000), in the course of rejecting the sham affidavit rule as a matter of Maryland procedure, the Maryland Court of Appeals exhaustively reviewed the federal appellate case law with respect to the sham affidavit rule, and concluded that the rule "applies only when there is a *flat contradiction of material fact* between the deposition testimony and the affidavit opposing summary judgment." *Id.* at 542, 754 A.2d at

---

[21] The *Cleveland* Court recognized that the federal appellate courts have adopted the sham affidavit rule "with virtual unanimity," but declined to "necessarily endorse these cases," although it adopted a similar rule with respect to whether a person who applies for social security disability benefits (which requires a disability so severe as to preclude the recipient from working) is thereby estopped from pursuing a disability discrimination claim under the Americans with Disabilities Act (which requires that a plaintiff show that she can perform the essential functions of a job, at least with reasonable accommodation). 526 U.S. at 806.

1045 (emphasis added).[22]

Of course, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge'" when ruling on a motion for summary judgment. *Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Liberty Lobby*, *supra*, 477 U.S. at 255). In order to avoid infringing upon the province of the fact finder, application of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat contradictions of material fact. What the Ninth Circuit said in *Van Asdale v. International Game Technology*, 577 F.3d 989, 998-99 (9th Cir. 2009) (internal citation omitted), is salient:

> [T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. Thus, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."

ADT has identified six assertions in Mandengue's Declaration that it contends contradict her previous deposition testimony. However, none of the statements flatly contradicts Mandengue's deposition testimony or creates a clear and unambiguous material inconsistency with her prior account. To be sure, there are some apparent discrepancies between plaintiff's deposition and her Declaration, and these may be fruitful avenues of cross-examination at a trial. But, in my view, none of them is so stark as to justify invocation of the sham affidavit rule.

The first alleged contradiction that ADT identifies is that, in her Declaration, Mandengue stated: "In August 2005, Jennifer Franey resigned and left the Company. After months of vacancy, Len Gill replaced her." Mandengue Decl. at 2. ADT argues that this statement

---

[22] After *Pittman* was decided, Maryland adopted a version of the sham affidavit doctrine by rule. *See* Md. Rule 2-501(e); *see also Marcantonio v. Moen*, 406 Md. 395, 959 A.2d 764 (2008) (discussing post-*Pittman* enactment of Md. Rule 2-501(e)).

contradicts Mandengue's testimony, at her deposition, that James Austin was the supervisor "for a couple of months" between Franey and Gill. Mandengue Dep. at 140. This is not a flat contradiction of fact. As discussed, the record is clear that there was a vacancy of several months in the position of resale manager, and that Austin provided "supervisory support" to the Columbia office during a part of that time. However, it is unclear whether Austin actually occupied the position of resale manager. Moreover, Austin's supervisory tenure is largely not in issue in the case. It is by no means clear that there is any true contradiction between Mandengue's statements in this regard, let alone a flat contradiction as to a material fact.

The second supposed contradiction between Mandengue's Declaration and her deposition is that, in her Declaration, Mandengue alleged that, at an unspecified time, Gill claimed Mandengue's "success[]" was due to "witchcraft" and "voodoo," Mandengue Decl. at 3, while at her deposition, she attributed such a statement to another co-worker involved in a conversation with Gill. Mandengue Dep. at 116-17. However, Mandengue also described that conversation (and attributed such a remark to the co-worker) in her Declaration. *See* Mandengue Decl. at 2-3. Moreover, the apparent discrepancy does not preclude the possibility that Gill and the co-worker, on separate occasions (or during the same conversation), both made comments about Mandengue referring to witchcraft or voodoo. To be sure, Mandengue's Declaration is ambiguous on this point, but there is no flat contradiction between it and her deposition testimony.

Similarly, at her deposition, Mandengue testified that, during her training period, Gill stated that a "woman will not do good in this job and especially when they [are] *older*." Mandengue Dep. at 83 (emphasis added). In contrast, in her Declaration, Mandengue asserted that Gill said both that "Women will never been [sic] successful in this business. . . . Especially when they are *old*," Mandengue Decl. at 2 n.1 (emphasis added), and that, "as a woman and

especially a *black* one, [Mandengue] will never be successful in this business."   *Id.* at 3 (emphasis added).   According to ADT, plaintiff contradicted her prior testimony by contending, in her Declaration, that Gill's comment implicated race, rather than age.   However, once again, plaintiff does not state the particular date that either comment was made, and it is possible that Gill made similar comments on different occasions.   That Mandengue recounts *both* comments in her Declaration tends to weaken ADT's argument that Mandengue's Declaration is a sham attempt to create a dispute of fact.   Although Mandengue may be vulnerable on cross-examination, the alleged contradiction does not trigger the sham affidavit rule.

The fourth discrepancy alleged by ADT stems from Mandengue's deposition testimony, in which she stated that she "didn't have access to other people's leads," Mandengue Dep. at 85, "didn't have access to other people's appointments in Telemar," *id.* at 90, and did not know what a co-worker's "production quotas were each month."   *Id.* at 115.   According to ADT, these statements amount to an admission by Mandengue that she "lacks any concrete, substantive knowledge as to the rate and number of leads received by other Resale Reps." ADT Reply at 4. Therefore, as ADT sees it, the Court should strike Mandengue's statements in her Declaration that each resale rep "had more than 400 leads to work with" in ASAP, and that Glazier had lowered her lead rotation to 1:5, "meaning, I would only receive 1 appt., when all other reps would receive 5."   Mandengue Decl. at 5.[23]   However, the fact that Mandengue had no direct access to other people's leads in ASAP or Telemar does not compel the conclusion that she was unaware of how many leads other resale reps in the office typically had.

---

[23] Notably, Godbee's affidavit does not indicate that Glazier ever reduced Mandengue's lead rotation to 1:5.  However, the record contains no suggestion that each resale rep did not know his or her own lead rotation ratio.  At most, then, there is a dispute of fact between the parties as to whether Mandengue's ratio was ever set at 1:5.  Mandengue's asserted knowledge that her own ratio was 1:5, and her knowledge that the implication of such a ratio was that each other resale rep would receive five leads for each lead she received, does not contradict her admission that she did not have direct access to other reps' leads in Telemar.

ADT also contends that Mandengue's statement in her Declaration that "[a]ttaining [her] goal every month was not a problem," Mandengue Decl. at 15, contradicts her concession that her production declined after Franey departed. *See* Mandengue Dep. at 144-45. But, this argument mischaracterizes Mandengue's position. Immediately after stating that meeting her production quota was "not a problem," Mandengue stated: "I would have been a top performer, if I had been treated fairly." Mandengue Decl. at 15. Plaintiff's contention is that her admitted low production was not the result of her inability; rather, it was due to employment discrimination.

Finally, ADT takes issue with plaintiff's statement in her Declaration that she "almost had a heart attack" in August 2007, Mandengue Decl. at 15, while at her deposition she testified that a cardiologist examined her and discovered that her "heart is fine." Mandengue Dep. at 36. However, on the same page of the deposition transcript, Mandengue stated that she was referred to the cardiologist because, when she reported to the hospital with chest pains, hospital personnel thought that she might be "having a heart attack because that's what [Mandengue] was thinking to [her]self." *Id.* Plaintiff's testimony is not inconsistent with her statement, as a layperson, that she "almost had a heart attack."

Accordingly, I see no basis to apply the sham affidavit rule. Moreover, I also reject ADT's arguments that certain statements in Mandengue's Declaration should be stricken as hearsay.

Hearsay is defined by Rule 801(c) of the Federal Rules of Evidence. It is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is "not admissible," absent a rule of evidence or other statute or rule that renders it admissible. Fed. R. Evid. 802. Moreover, at the summary

judgment stage, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Accordingly, "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991); *accord Barnes v. Montgomery County*, 798 F. Supp. 2d 688, 691 (D. Md. 2011) ("[H]earsay statements . . . cannot support or defeat a motion for summary judgment.").

There are several exceptions to the rule against hearsay, however, one of which is the admission of a party-opponent, under Fed. R. Evid. 801(d)(2). That rule provides that a "statement is not hearsay" if it is "offered against a party" and meets one of several conditions that permit the statement to be attributed to that party. Of particular relevance here is Rule 801(d)(2)(D), which makes "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," admissible as  a non-hearsay admission of the party-opponent. The statements in Mandengue's Declaration that ADT challenges either do not satisfy the definition of hearsay under Rule 801(c), or qualify as admissions of a party-opponent under Rule 801(d)(2)(D).

First, ADT challenges the admissibility of Gill's alleged derogatory statements made during Mandengue's training period. A statement is not hearsay if it is offered to show that the statement was made, and not "to prove the truth of the matter asserted" in the statement. Fed. R. Evid. 801(c). *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 173 n.18 (1988). Gill's statements during the training—for instance, that Mandengue "lived in the jungle before," Mandengue Decl. at 2 n.1—are not offered to prove the truth of the matter asserted, *i.e.*, that Mandengue actually "lived in the jungle." Rather, Mandengue offers them to prove that Gill made the statements, evincing his alleged discriminatory attitude towards her. *See*, *e.g.*, *Warren*

*v. Fort Lincoln Cemetery Inc.*, Civ. No. AW-00-419, 2001 WL 743199, at *3 (D. Md. June 26, 2001) ("[T]he statements at issue are not offered to prove the truth of the matter asserted, *i.e.*, the black employees of Fort Lincoln are 'niggers.' Rather, the significance of the statements lies in the fact that they were made by the manager of the office. Therefore, the statements are not inadmissible hearsay."); *see also Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995) ("The disparaging and racist comments . . . were not offered to prove the truth of the statements but to demonstrate the racial attitudes of [the speakers].  Accordingly, the statements are not hearsay.").  Because the statements are offered to prove that Gill made the statements to Mandengue, and not for the truth of the matters asserted by Gill, the statements are not hearsay.

The other statements challenged by ADT all come within the exception to the rule against hearsay under Rule 801(d)(2)(D), because all of them are statements made by ADT employees, about matters within the scope of their employment.  Notably, ADT asserts (without elaboration) that the employees who made the challenged statements were not "manager[s] for ADT" at the time of the statements.  But, Rule 801(d)(2)(D) does not require that the employee-declarant be a manager; it requires only that the statement be made during the declarant's employment, about matters within the scope of the declarant's employment.  *See United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 310-11 (4th Cir. 2000) (stating, under Rule 801(d)(2)(D): "The corporation's agent need not have authority to make the statement at issue, but rather the subject of the statement must relate to the employee's area of authority."); *see also Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 619-20 (4th Cir. 1991); *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 321 (4th Cir. 1982).  Accordingly, none of the challenged statements are barred by the rule against hearsay.

ADT's contention that Mandengue's Declaration is merely conclusory is also without merit. The Declaration is certainly vague in some particulars (most notably the dates of many of the alleged statements) and is quite disorganized in its presentation of the evidence. But, it alleges specific facts and incidents related to Mandengue's employment, and is not subject to being struck as conclusory. Accordingly, I turn to the merits of the parties' dispute.

### D.  Title VII Discrimination Claims Regarding Glazier

Plaintiff claims that, in discharging her, ADT discriminated against her on the basis of race, sex, and/or national origin, in violation of Title VII of the Civil Rights Act of 1964. Title VII prohibits an "employer,"[24] *inter alia*, from discharging or discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Moreover, as amended by the Civil Rights Act of 1991, Title VII expressly provides for "mixed-motive" liability, stating: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). *See Diamond*, *supra*, 416 F.3d at 317 ("Congress amended the Civil Rights Act to provide explicitly for liability in mixed-motive cases.").[25]

As discussed, a plaintiff alleging employment discrimination may proceed under two methods of proof: (1) presentation of "direct or circumstantial evidence that raises a genuine

---

[24] There is no dispute that ADT is an "employer" within the meaning of Title VII. *Cf.* 42 U.S.C. §§ 2000e(b) (definition of "employer" for Title VII purposes); 2000e-1(a) (exemptions regarding religious institutional employers and employment of aliens in certain circumstances).

[25] Before 1991, courts analyzed mixed-motive liability under Title VII and other anti-discrimination statutes under a similar rubric endorsed by a plurality of the Supreme Court in *Price Waterhouse v. Hopkins*, *supra*, 490 U.S. 228, 237-47 (1989).

issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision," *Diamond*, 416 F.3d at 318; or (2) use of the *McDonnell Douglas* burden-shifting framework. *Id.* Plaintiff's Title VII claims fail under either approach.

Under ordinary principles of proof, plaintiff has presented no direct evidence to show that her race, sex, or national origin were motivating factors in Glazier's decision to terminate her employment. Nor has she submitted any indirect or circumstantial evidence that could support such a determination.

In *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the showing that is required to withstand summary judgment via ordinary principles of proof:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action. *See Brinkley*, 180 F.3d at 608 ("To survive summary judgment on the basis of direct and indirect evidence, Brinkley must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action.").

The closest plaintiff comes to any evidence to suggest that her race, sex, or national origin played a part in Glazier's decision to terminate her or take any other action with respect to her is a single, ambiguous comment allegedly made by Glazier on an unknown date, in which he made her the "center of attention" at a staff meeting, and mentioned the "way [she] talk[s]," in the course of criticizing her "performance." Mandengue Dep. at 166-67. It is particularly noteworthy that plaintiff has not provided the date of Glazier's alleged comment, and so the Court is unable to discern whether the comment was made in any degree of temporal proximity

to her termination.  In any event, even if this ambiguous comment could somehow be construed as implicating Mandengue's accent and, by extension, her race or national origin, plaintiff has presented absolutely "no evidence showing this comment was more than an isolated event or that it had any nexus with the decision to terminate [her]."  *Warch*, 435 F.3d at 520 (upholding summary judgment in favor of defendant in age discrimination suit despite single comment that "'hiring people at that age, they didn't get the work out of them that they did younger people.'").

Plaintiff fares no better in connection with the *McDonnell Douglas* framework.  As to alleged unlawful termination under Title VII, the Fourth Circuit recently reiterated the following formulation of the *McDonnell Douglas prima facie* case:

> "(1) [Plaintiff] is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class."

*Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (quoting *Hill*, *supra*, 354 F.3d at 285).

It is undisputed that plaintiff is a member of a protected class and suffered an adverse employment action.  No evidence has been offered by either party as to the fourth prong of the *prima facie* case.  As to the third prong, I agree with ADT, *see* ADT Motion at 24, that plaintiff cannot show that she was meeting ADT's legitimate expectations at the time of her termination, due to her long history of failing to satisfy her sales quota as a resale rep.  Accordingly, her *prima facie* case is deficient as to the third prong.

Even assuming, *arguendo*, that plaintiff could demonstrate a *prima facie* case, the ample, unrefuted evidence of plaintiff's failure to satisfy her sales quotas plainly satisfies ADT's burden to "'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Adams*, *supra*, 640 F.3d at 559 (citation omitted).  Therefore, plaintiff must demonstrate that she

could prove to a fact finder "'*both* that the reason was false, *and* that discrimination was the real reason.'"  *Id.* at 560 (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original); *see also Burdine*, *supra*, 450 U.S. at 256 (stating that plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision").  Plaintiff has failed to do so.

Plaintiff has asserted that Glazier transferred her leads to other resale reps, and alleges, without providing specific details, that Glazier gave more leads to resale reps of other races, such as Veloso, who is Asian, and Toppi, who is white.  However, the transferred lead as to which she provides the most detail, customer Louise Howard, was transferred to fellow resale rep Frazier, who is African-American.  *See* Glazier Aff. ¶ 15.  Moreover, ADT has submitted unrebutted records showing the "Ethnic Origin" of each of the resale reps in Glazier's sales unit and each rep's sales quota performance during Glazier's supervisory tenure.  *See* Ex.B to Glazier Aff. Seven of the resale reps, including Mandengue, are listed as "Black"; six are listed as "White"; one is listed as "Asian"; and one is listed as "American Indian or Alaska[n]."  *Id.*  Without belaboring the point, there is no correlation between the employees' "Ethnic Origin" and their sales performance, so as to suggest that sales performance was a pretext for racial discrimination. Nor has plaintiff advanced any evidence to suggest that Glazier's decision was a pretext for discrimination on the basis of sex or national origin.

To be sure, viewing the evidence in the light most favorable to plaintiff, there is evidence that Glazier reassigned plaintiff's leads on a number of occasions.  As a resale manager, Glazier was required to manage the leads distributed to his resale reps to ensure that the office met its overall sales quota.  Glazier had the discretion to redistribute leads, and in doing so, was required to strike a balance, in a commission-based sales environment: he had to give each rep sufficient

opportunities to complete sales so as to meet the rep's quota, while at the same time ensuring that he distributed quality leads to reps who could convert them into contracts and did not squander good leads on reps who could not close the deals.

Perhaps Glazier's treatment of plaintiff was unfair in this regard, because reassignment of her leads arguably hindered her from achieving her production quotas.  But, Title VII does not "'declare unlawful every arbitrary and unfair employment decision.'"  *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994) (citation omitted).  Rather, it prohibits discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Once an employer has provided a legitimate, non-discriminatory reason for termination of an employee, it is not the province of the judiciary "'to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'"  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (citation omitted); *see also Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir. 2007) ("It is axiomatic that an employer is free to set its own performance standards, provided such standards are not a 'mask' for discrimination."), *overruled on other grounds by Nat'l R.R. Passenger Corp.*, 536 U.S. 101, 105 (2002); *Jiminez*, *supra*, 57 F.3d at 383 ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment").

Plaintiff has not presented any evidence by which a fact finder could conclude that Glazier's actions constituted discrimination under Title VII.  Accordingly, summary judgment will be granted to ADT with respect to Counts I, III, and IV.

### E.  ADEA Claim

For much the same reasons as with her Title VII claims, plaintiff's claims of age discrimination under the ADEA also cannot withstand summary judgment.

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  However, the ADEA's protections are "limited to individuals who are at least 40 years of age."  *Id.* § 631(a).  Plaintiff, who was 49 years old when she was terminated, is clearly within the ADEA's protection.

The Supreme Court has held that, unlike Title VII, the ADEA does not permit "a mixed-motives age discrimination claim."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, ___, 129 S. Ct. 2343, 2350 (2009).  Rather, given that ADEA liability hinges on discrimination "*because of* . . . age," 29 U.S.C. § 623(a)(1) (emphasis added), the plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action."  *Gross*, 557 U.S. at ___, 129 S. Ct. at 2351.

With respect to Glazier, plaintiff points to only one undated comment by him that concerned plaintiff's age: Glazier's alleged statement that "sometime in this business . . . you depend on younger people can understand [sic], you know, so they learn quicker."  Mandengue Dep. at 287.  But, the Fourth Circuit has held that "general or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination."  *Mereish v. Walker*, 359 F.3d 330, 336-37 (4th Cir. 2004).  Assuming that Glazier made the comment as reported by Mandengue, summary judgment cannot be averted based on a single, isolated comment, which was not even directly connected to the decision to fire the plaintiff.

In *Mereish*, the Court held that stray comments by the plaintiff's supervisor expressing "concern about the aging workforce" at the employing agency, the " 'tunnel vision' and lack of flexibility characteristic of some scientists," and the "'problem' of the 'average age going higher'" did not suffice as evidence of discriminatory animus.  *Id.* at 336.  Similarly, in *Warch*,

*supra*, 435 F.3d at 520, a supervisor's comment that "a job candidate who happened to be similar in age and experience to Warch would have a hard time getting a job because 'hiring people at that age, they didn't get the work out of them that they did younger people,'" could not avert summary judgment against the plaintiff where plaintiff presented "no evidence showing that this comment was more than an isolated event or that it had any nexus with the decision to terminate him." *See also Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (holding that the statement that "there comes a time when we have to make way for younger people" simply reflects "a fact of life" and could not create any "inference of age bias"); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942-43 (4th Cir. 1992) (holding that references to the need to "attract newer, younger people" or "young blood" were insufficient evidence of age bias); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (holding that a reference to needing "some new young blood" was not probative of age bias); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (same).

It is also notable that, although plaintiff claimed, in her Second Amended Complaint, to be "the oldest sales person in the residential resale group," Second Amended Complaint ¶ 164, ADT has presented unrebutted evidence that, in fact, plaintiff's fellow resale rep, Maria Tess Veloso, is approximately eight years older than Mandengue.  *See* Aaron Aff. ¶ 5.  Veloso achieved sales performance over 100% to quota in every month that she and Mandengue were co-workers.  *See* Ex.B to Glazier Aff.

Perhaps more important, given that ADEA liability only accrues if age is a "but for" cause of the decision to terminate, *see Gross*, *supra*, 557 U.S. at ___, 129 S. Ct. at 2351, Mandengue has advanced absolutely no evidence from which a fact finder could conclude that ADT's stated and well documented concerns regarding her sales performance were unfounded or

pretextual, as I have already discussed in detail in connection with the Title VII claims. For all of these reasons, even if plaintiff could establish a *prima facie* case of age discrimination under the ADEA, she has not presented evidence from which a finder of fact could conclude that her age was the "but-for" cause of her termination using either the *McDonnell Douglas* framework or ordinary principles of proof.

In addition to the allegations regarding her termination by Glazier, plaintiff included in Count VI of the Second Amended Complaint a single allegation referring to her alleged treatment by Gill. Specifically, she alleged that "Merideth Cole, who was at least nineteen (19) years younger than Plaintiff, and was a salesperson in the residential resale group, was treated more favorably than Plaintiff." Second Amended Complaint ¶ 167.[26] However, the ADEA is subject to the same administrative exhaustion requirements as apply to claims under Title VII. *See, e.g.*, *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) ("Before a plaintiff may file suit under Title VII or the ADEA, he is required to file a charge of discrimination with the EEOC. . . . The same limitation periods apply regarding ADEA claims [as apply under Title VII].")*; see also* 29 U.S.C. § 626(d) (establishing administrative exhaustion requirement under ADEA). In particular, a charge of discrimination must be filed with the EEOC, at the latest, 300 days after the alleged discriminatory practice occurred.[27] As Judge Bennett discussed, plaintiff filed her EEOC charge on April 16, 2008; therefore, she could not raise any Title VII or ADEA claims with respect to alleged discriminatory acts that occurred more than 300 days before that date, *i.e.*, acts that occurred before June 21, 2007. Gill ceased to supervise plaintiff in December

---

[26] In her Declaration and deposition testimony, Mandengue also mentioned undated comments by Gill referring to her age in conjunction with her gender and her race.

[27] The 300-day period applies "'when state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency.'" *Jones*, 551 F.3d at 300. In all other circumstances, a charge must be filed with the EEOC within 180 days after occurrence of the discriminatory practice. *Id.*; *see also* 29 U.S.C. § 626(d)(1)(A)-(B).

2006.  For the same reason that plaintiff's Title VII claims with respect to Gill's alleged conduct are time-barred, her ADEA claim with respect to his conduct is also time-barred.

Accordingly, ADT is entitled to summary judgment as to Count VI in its entirety.

### F.  Title VII Retaliation Claim

In Count V of her Second Amended Complaint, plaintiff alleges that "Glazier took actions against Plaintiff after she went to HR," Second Amended Complaint ¶ 150, and that these actions constituted retaliation because of plaintiff's complaints, in violation of Title VII.

"The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *cert. granted*, 131 S. Ct. 3059 (2011); *see also Beall*, *supra*, 130 F.3d at 619. However, as in the *McDonnell Douglas* context, "[i]f a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [her] termination, the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, *supra*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

It is doubtful that plaintiff can establish a *prima facie* case of retaliation, because her evidence as to the first prong, *i.e.*, that she engaged in a protected activity, is quite thin.  But, even if plaintiff could establish a *prima facie* case, her claim fails at the pretext stage.  I shall explain.

"[I]n the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005), *cert. denied*, 547 U.S. 1041 (2006).  Protected oppositional activity, which is relevant

here, "may include 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities,' as well as 'complain[ts] . . . about suspected violations'" of Title VII. *Id.* (internal citations omitted). The Fourth Circuit has held that the filing of an equal employment opportunity ("EEO") complaint constitutes protected activity. *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir.), *cert. denied*, 540 U.S. 1073 (2003). The appellate court has also held that, in the context of a sexual harassment suit, complaining to superiors about "harassment" qualifies as protected activity, even where the complaint "did not explicitly mention sexual harassment" and did not "detail the sexual incidents [the employee] later relayed." *Okoli v. City of Baltimore*, 648 F.3d 216, 223-24 (4th Cir. 2011).

Here, it is undisputed that plaintiff complained to Harris about her treatment by Glazier, and that a meeting was held between plaintiff, Glazier, and Harris to address plaintiff's concerns. What is much less clear, however, is whether plaintiff ever articulated to Harris (during the meeting or otherwise) any contention that Glazier's treatment of her constituted unlawful discrimination based on her race, sex, or national origin. In her Declaration, Mandengue states that, at one point, she told Harris "everything that had been going on" with regard to Glazier's "behavior." Mandengue Decl. at 6. And, according to plaintiff, during the August 2007 meeting between Mandengue, Glazier, and Harris, Mandengue said that she "was harassed and discriminated against by Robert." Mandengue Decl. at 9. However, her itemization of the matters discussed in the meeting discloses only that she was concerned about her differential treatment with respect to other resale reps—not that she claimed that the differential treatment was based on race, sex, or national origin. *Id.* Moreover, Mandengue's own notes from the meeting, *see* Ex.1 to Mandengue Motion, her contemporaneous emails to Harris and Glazier, *see* Ex.3, 12, 13, 13b to Mandengue Motion, and her notes regarding other interactions with Glazier

from the same time period, *see* Ex.9, 22 to Mandengue Motion, contain no hint that Mandengue attributed Glazier's actions to discrimination based on any protected classification.  In sum, other than plaintiff's bald assertion that she complained that she was "discriminated against," she has advanced no evidence that her complaints to Harris constituted protected activity under Title VII.

But, even if plaintiff has made out a *prima facie* case of retaliation, for all the reasons already amply discussed, she has submitted no evidence to show that Glazier's well documented concerns about her consistently poor sales performance, which were the stated basis for her termination, were misplaced or pretextual.  "Workers are shielded from retaliation on account of their assertion of rights protected under Title VII.  But a complaining worker is not thereby insulated from the consequences of . . . poor performance."  *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008).  Accordingly, plaintiff's retaliation claim fails.

### G.  § 1981 Claim

Like Title VII, 42 U.S.C. § 1981 prohibits, *inter alia*, "discrimination in employment on the basis of race."  *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006).  *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race").  In relevant part, 42 U.S.C. § 1981(a) provides: "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  Section 1981(b) states: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[28]

---

[28] Section 1981(b) was enacted as part of the Civil Rights Act of 1991 in order to overrule legislatively the Supreme Court's holding in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), to the effect that § 1981 applied "only to the formation of a contract" and not "to conduct by the employer after the contract relation has been established, including breach of

Section 1981 does not prohibit discrimination based "solely on the place or nation of [the plaintiff's] origin." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). However, § 1981 is interpreted in light of the prevailing conception of "race at the time § 1981 became law," circa 1870,[29] *id.* at 610, when "race" was understood to refer to "identifiable classes of persons" on the basis of "ancestry or ethnic characteristics." *Id.* at 613; *see also id.* at 611 (discussing 19th-century conception of race "in terms of ethnic groups," and including "Finns, gypsies, Basques, . . . Swedes, Norwegians, Germans, . . . Italians, Spanish, Mongolians, Russians, Arabs, Jews, . . . Hungarians, and Greeks," *inter alia*, as distinct "races") (internal citations omitted). Moreover, § 1981 also "prohibits private discrimination against aliens." *Duane v. GEICO*, 37 F.3d 1036, 1044 (4th Cir. 1994), *cert. granted*, 513 U.S. 1189, *cert. dismissed*, 515 U.S. 1101 (1995).

"[T]he framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII, or § 1981, or both statutes." *Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989); *see also Proa v. NRT Mid Atlantic, Inc.*, 618 F. Supp. 2d 447, 461 (D. Md. 2009). In particular, discrimination may be proven either by direct or indirect proof or, instead, via the *McDonnell Douglas* framework. *See, e.g.*, *Lightner*, *supra*, 545 F.3d at 263 n.*. Moreover, district court decisions in this circuit, supported by dictum from the Fourth Circuit, have concluded that mixed motive liability accrues under § 1981, although neither the Fourth

---

the terms of the contract or imposition of discriminatory working conditions." *Id.* at 176-77. *See generally CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449-51 (2008) (discussing post-*Patterson* enactment of § 1981(b)).

[29] The text of what is now § 1981(a) was codified in 1874 as an amalgam of provisions originally enacted in the Civil Rights Act of 1866 and the Voting Rights Act of 1870. *See generally Duane v. GEICO*, 37 F.3d 1036, 1038-39 (4th Cir. 1994) (discussing Reconstruction-era origin of § 1981), *cert. granted*, 513 U.S. 1189, *cert. dismissed*, 515 U.S. 1101 (1995).

Circuit nor the Supreme Court has definitively resolved the issue. *See Blasich v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 401 (D. Md. 2009) ("The mixed-motive method of analysis is available in [a] § 1981 action."); *Jackson v. Blue Dolphin Communications of N.C.*, 359 F. Supp. 2d 442, 455 n.5 (W.D.N.C. 2004); *Disher v. Weaver*, 308 F. Supp. 2d 614, 622 n.4 (M.D.N.C. 2004); *see also Worden v. Sun Trust Banks, Inc.*, 549 F.3d 334, 342 (4th Cir. 2008) (adopting mixed-motive analysis under Employee Polygraph Protection Act; relying, in part, on Eighth Circuit case law endorsing mixed-motive analysis in § 1981 cases) (citing *Williams v. Fermenta Animal Health Co.*, 984 F.2d 261, 265 (8th Cir. 1993)).[30]

In this case, plaintiff's allegations of discrimination by Gill are thin. Ordinarily, "general statements of dissimilar treatment" that "lack[] detail" do not suffice to avoid summary judgment with respect to a claim of employment discrimination. *Gilliam v. S.C. Dept. of Juvenile Servs.*, 474 F.3d 134, 142-43 (4th Cir. 2007). Nevertheless, as I see it, plaintiff's claims as to Gill are sufficiently specific to permit a fact finder to conclude that he discriminated against her on the basis of her race.

According to Mandengue, Gill "always had negative comments" about her; in "Monday's meeting, [Mandengue] was always [Gill's] victim"; and working under him was a "nightmare." Mandengue Decl. at 6. As noted, plaintiff has provided specific examples of Gill's discriminatory statements, including the statements or suggestions that Mandengue performed

---

[30] It is unclear whether the appropriate mixed-motive standard for § 1981 claims is derived from Title VII, as amended by the Civil Rights Act of 1991, or, instead, from the Supreme Court's decision in *Price Waterhouse, supra*, 490 U.S. 228 (1989). In either case, an employer may be liable if its adverse employment action was prompted by a mixed motive, *i.e.*, both legitimate and discriminatory reasons. The principal difference is that, under *Price Waterhouse*, it is a complete affirmative defense to liability for the employer to show "that its legitimate reason, standing alone, would have induced it to make the same decision." *Id.* at 252. Under the statutory mixed-motive standard, such a showing is only a partial affirmative defense: it restricts the plaintiff's recovery "to injunctive and declaratory relief, and attorney's fees and costs." *Diamond, supra*, 416 F.3d at 317 & n.2 (citing 42 U.S.C. § 2000e-5(g)(2)(B)). Neither party has discussed the standards for mixed-motive liability under § 1981.

"voodoo" or "witchcraft" on customers; that, as a "woman and especially a black one," Mandengue would never be successful in the business;[31] that Mandengue "should go back to Cameroon";[32] that she was not entitled to complain because she "lived in the jungle"; and ridicule of Mandengue's accent.  *Id*. at 2-3.  Although plaintiff has not provided dates for any of Gill's statements, or the details of any other alleged derogatory remarks, she has alleged (albeit in general terms) that such comments were pervasive during Gill's tenure as supervisor. Moreover, on the present state of the record, there is no dispute of material fact as to whether Gill made these statements.

To be sure, Gill did not participate in the decision to terminate plaintiff's employment, which was made months after Glazier replaced Gill as resale manager.  However, plaintiff alleges that Gill failed to provide her with leads, and changed her lead rotation in Telemar. Mandengue Motion at 6.  And, ADT confirms that, on at least one occasion, Gill constrained Mandengue's sales territory in Telemar to Baltimore City.  Such conduct arguably played a role in plaintiff's eventual termination due to poor performance, and may also constitute adverse employment action standing alone.[33]

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'"  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008).  Put another way, an adverse employment action "is one that 'constitutes a significant change in employment status, such as

---

[31] Although this statement suggests bias on the basis of both sex and race, only the racial component is actionable under § 1981.

[32] Discrimination based solely on national origin is not actionable under § 1981.  But, a fact finder could conclude that this statement was evidence of racial discrimination under the standards discussed by the Supreme Court in *Al-Khazraji*, *supra*, 481 U.S. 604.

[33] Plaintiff also alleges that Gill did not properly train her, instead devoting all of his attention to plaintiff's younger, white co-worker, Cole, and refusing to answer plaintiff's questions during the training.  *See* Mandengue Decl. at 2.

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Hoyle, supra*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  Case law, albeit from outside this circuit, indicates that manipulation and withholding of customer leads can constitute an adverse employment action in a commission-based sales environment, where an employee's bottom-line compensation and employment success are entirely dependent on her ability to initiate and complete sales.  *See, e.g.*, *Ramirez v. Olympic Health Mgmt. Sys., Inc.*, 610 F. Supp. 2d 1266, 1280-82 (E.D. Wash. 2009); *Dawson v. Phila. Media Holdings, LLC*, Civ. No. 06-3604, 2008 WL 2795832, at *15-18 (E.D. Pa. July 18, 2008); *Legrand v. New York Restaurant Sch./Educ. Mgmt. Corp.*, No. 02-Civ-2249, 2004 WL 1555102, at *4 (S.D.N.Y. July 12, 2004); *Parrish v. Sollecito*, 258 F. Supp. 2d 264, 269-70 (S.D.N.Y. 2003).  *But see Brown v. Sybase*, 287 F. Supp. 2d 1330, 1341-42 (S.D. Fla. 2003) (holding that unequal distribution of sales leads did not qualify as adverse employment action where there was "no evidence in the record as to the extent of impact, if any, that a lack of sales leads might have on [plaintiff's] . . . ability to make sales").

Although the record certainly could be clearer, I am satisfied that plaintiff has advanced circumstantial evidence from which a fact finder could determine that Gill denied Mandengue sales leads, and that Mandengue's race was at least a motivating factor in that denial.

Moreover, I am satisfied that Mandengue has advanced sufficient evidence to proceed under the *McDonnell Douglas* framework.  As discussed, it is undisputed that Mandengue belongs to a protected class, and I am persuaded by the cases, cited earlier, standing for the proposition that denial of sales leads can constitute an adverse employment action.  Although ADT argues strenuously that, as a matter of law, Mandengue cannot show that she was meeting her employer's legitimate expectations, the record is not so clear cut.  When Franey was

supervisor, plaintiff's performance was not stellar, but there is no indication that she was not meeting her employer's expectations. Mandengue's performance fell during the supervisory vacancy and brief period of supervision by James Austin that occurred before Gill became resale manager. But, plaintiff offers plausible explanations for this decrease in performance, based on the supervisory vacancy (which meant that there was no supervisor to distribute company leads) and her excused leave of absence for over a month to attend a funeral in South Africa. Certainly, at the time that Gill became resale manager, plaintiff did not have the long history of failing to meet her sales performance quota that she had later amassed by the time of her termination. And, to the extent that ADT has offered a legitimate, non-discriminatory reason for Gill's denial of leads to Mandengue (and ADT has advanced very little evidence whatsoever regarding the time period when Gill was supervisor), Mandengue has submitted plausible rebuttal evidence in the form of Gill's alleged discriminatory comments.

Finally, a fact finder could conclude that Gill's comments and actions toward plaintiff constituted a hostile work environment. A claim of hostile work environment is premised on the notion that "an employee's work environment is a term or condition of employment." *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009) (internal citations and quotation marks omitted). Hostile work environment claims are cognizable under § 1981. *See, e.g.*, *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292 (4th Cir. 2004).[34]

---

[34] Plaintiff's Second Amended Complaint does not set forth a separate count asserting a hostile work environment or, indeed, even use the term "hostile work environment." However, the Second Amended Complaint alleges Gill's pervasive comments, describing some of the specific comments later iterated in Mandengue's Declaration and deposition testimony and stating, for instance that "Gill would constantly make fun of Plaintiff with unpleasant jokes about her origin, [and] the way she talked." Second Amended Complaint ¶ 28. ADT does not suggest that plaintiff has not adequately pleaded a hostile work environment claim; rather, ADT has addressed the hostile work environment claim on the merits, arguing strenuously that plaintiff's "claims against Mr. Gill do not meet the high evidentiary bar required to demonstrate a hostile work environment." ADT Reply at 9. *(cont'd…)*

"To survive summary judgment on a claim of a racially hostile work environment," a plaintiff must provide evidence of harassment by her co-workers, which a reasonable jury could find was "'(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere,'" and must also show "'that there is some basis for imposing liability' for the harassment on the employer." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 668 (4th Cir. 2011) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001)). In *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008), the Fourth Circuit elucidated the "severe or pervasive" prong:

> The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (citing *Harris* [*v. Forklift Sys., Inc.*], 510 U.S. [17,] 21-22 [(1993)]). First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21-22. Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). . . .
>
> This objective inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. Rather, when determining whether the harassing conduct was objectively "severe or pervasive," we must look "at all the circumstances," including "the frequency of the discriminatory

---

In my view, "although the complaint did not refer specifically to 'hostile work environment harassment,' it did describe the harassment [plaintiff] experienced in enough detail to put the claim before the court." *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000); *see also Villaras v. Geithner*, Civ. No. JFM-08-2859, 2009 WL 3418574, at *7 (D. Md. Oct. 20, 2009) ("Although Plaintiff's Complaint is not a model of clarity, these Counts [which asserted acts of "harassment and abuse" without using the term "hostile work environment"] contain sufficient detail to properly be considered as hostile work environment claims in this Court."); *Sekyere v. City of New York*, Civ. No. 5-7192, 2009 WL 773311, at *7 (S.D.N.Y. March 18, 2009) ("Although Plaintiff does not explicitly plead a hostile work environment claim in her Complaint . . . [g]iven that the essential elements of a hostile work environment claim appear in Plaintiff's Complaint and that both parties argue the issue of a hostile work environment in their summary judgment briefs, the Court finds consideration of the claim to be appropriate."); *Soliz v. Assocs. in Med.*, No. H-06-2785, 2007 WL 2363304 (S.D.Tex. Aug. 17, 2007) ("Though it does not appear that [plaintiff] has pleaded a hostile work environment in her first amended complaint, in the interest of general pleading rules, the court will address the argument.").

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23; *Ocheltree*, 335 F.3d at 333. "[N]o single factor is" dispositive, *Harris*, 510 U.S. at 23, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale*, 523 U.S. at 81-82.

While this standard surely prohibits an employment atmosphere that is "permeated with discriminatory intimidation, ridicule, and insult," *Harris*, 510 U.S. at 21 (internal quotations omitted), it is equally clear that Title VII does not establish a "general civility code for the American workplace," *Oncale*, 523 U.S. at 80. This is because, in order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Indeed, as the Court observed, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotations and citations omitted); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).

Our circuit has likewise recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test. Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than "rude treatment by [coworkers]," *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006), "callous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), are not actionable . . . .

In this case, Gill's alleged conduct amounted to more than mere rude or callous behavior. Rather, a reasonable person could view his statements as racially offensive. The record certainly leaves some question as to whether Gill's conduct was pervasive; plaintiff has only alleged about a half dozen specific comments over the approximately eight months that she was supervised by Gill. However, she alleges that such verbal abuse by Gill was a routine occurrence and, viewing the record in the light most favorable to plaintiff, as I must, I am convinced that whether Gill's conduct was "severe or pervasive" is a question for the jury, rather than a question of law.

Neither party has addressed in its argument the fourth prong of a hostile work environment—specifically, whether there is a basis to impose liability for Gill's conduct on ADT.  In light of the parties' failure to address the issue, I will not rule on it.

In sum, plaintiff has presented a case that is sufficient to survive summary judgment as to her § 1981 claims concerning Gill's behavior.  Although plaintiff's case, as currently presented, appears quite weak factually, even weak cases may survive summary judgment.  Accordingly, I will deny summary judgment to ADT as to Count II.

## Conclusion

For the foregoing reasons, ADT's motion for summary judgment will be granted in part and denied in part, and Ms. Mandengue's motion for summary judgment will be denied.  In particular, ADT will be granted summary judgment as to all counts except for Count II of plaintiff's Second Amended Complaint, raising a claim of employment discrimination under 42 U.S.C. § 1981.  An Order implementing my ruling follows.


Date:   March 14, 2012                    _____/s/_____
                                          Ellen Lipton Hollander
                                          United States District Judge